IN THE CIRCUIT COURT OF WASHINGTON COUNTY, MISSISSIPPI

STATE OF MISSISSIPPI

   V.                                 NO. 2019-0061

JESSICA FRYREAR, RODERICK PAYNE,
EUGENE SANDERS                      DEFENDANTS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
PARTIAL TRANSCRIPT OF THE PROCEEDINGS HAD AND DONE IN THE
TRIAL OF THE ABOVE STYLE AND NUMBERED CAUSE, BEFORE THE
HONORABLE ASHLEY HINES, CIRCUIT JUDGE, AND A JURY OF
TWELVE MEN AND WOMEN, DULY IMPANELED, ON THE 22ND DAY OF
JULY 2021
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

APPEARANCES:

    KAYLON McCOU, ESQUIRE
    AUSTIN FRYE, ESQUIRE
    Assistant District Attorneys
    Post Office Box 426
    Greenville, Mississippi  38702-0426
        PRESENT AND REPRESENTING THE STATE

    PATRICIA RODGERS, ESQUIRE
    MARVIN SANDERS, ESQUIRE
    Public Defender's Office
    Post Office Box 273
    Greenville, Mississippi  38702-0273
        PRESENT AND REPRESENTING DEFENDANT JESSICA
        FRYREAR

    JAMES K. LITTLETON, ESQUIRE
    Littleton Law Office
    Post Office Box 1155
    Greenwood, Mississippi  38935
        PRESENT AND REPRESENTING DEFENDANT RODERICK
        PAYNE

            (Appearances continued)



```
 1        E. TUCKER GORE, ESQUIRE
          Attorney at Law
 2        207 Lillian Street
          Greenwood, Mississippi 38930
 3            PRESENT AND REPRESENTING DEFENDANT EUGENE
              SANDERS
 4
          DERRICK SIMMONS, ESQUIRE
 5        Simmons & Simmons
          Post Office Box 1854
 6        Greenville, Mississippi  38702
              PRESENT AND REPRESENTING DEFENDANT APRIL MILLER
 7
     REPORTED BY:
 8
                        TRUDIE QUINN
 9               Official Court Reporter
                      CCR #1368
10              Post Office Box 180506
               Richland, Mississippi  39218
11                  (601) 932-5354

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# I N D E X

                                                                    **PAGE**

Style, Number and Appearances ..................... 1

Index ............................................. 2

                            – o –

                    **WITNESS: STATE**

                      APRIL MILLER

Direct Examination by Mr. McCou ................... 5

Cross-Examination by Ms. Rodgers ................. 21

Cross-Examination by Mr. Littleton ............... 40

Cross-Examination by Mr. Gore .................... 62

Redirect Examination by Mr. McCou ................ 65

                            – o –

                    **WITNESS:  DEFENSE**

                      LISA LATHAM

Direct Examination by Ms. Rodgers ................ 71

Cross-Examination by Mr. Littleton ............... 75

Cross-Examination by Mr. McCou ................... 81

                            – o –

Reporter's Page .................................. 83

Certificate of Reporter .......................... 84

                            – o –

```
1                    P R O C E E D I N G S
2              BY MR. McCOU:  The State calls April
3        Miller, your Honor.
4                    APRIL MILLER,
5   called on behalf of the State, having been duly sworn by
6   the deputy clerk, was examined and testified as follows:
7              BY MR. McCOU:  May I proceed, your Honor?
8              BY THE COURT:  You may proceed.
9              BY MR. McCOU:  Your Honor, may the witness
10       remove her mask?
11             BY THE COURT:  She may.
12  DIRECT EXAMINATION BY MR. McCOU:
13       Q.    If you would, state your name for the record.
14       A.    April Miller.
15       Q.    Ms. Miller, do you know a Eugene Sanders?
16       A.    Yes, sir.
17       Q.    Do you see him today?
18       A.    Yes, sir.
19       Q.    Would you point to him and tell us what he's
20  wearing?
21       A.    A pink shirt.
22             BY MR. McCOU:  Your Honor, may the record
23       reflect Ms. Miller has identified the defendant
24       Eugene Sanders?
25             BY THE COURT:  Let the record so reflect.
```

1      Q.     Do you know a Roderick Payne?

2      A.     Yes, sir.

3      Q.     Do you see him today?

4      A.     Yes, sir.

5      Q.     Point to him and tell us what he's wearing?

6      A.     A purple shirt.

7            BY MR. McCOU:  Your Honor, may the record

8    reflect that she's identified the defendant

9    Roderick Payne?

10            BY THE COURT:  Let the record so reflect.

11      Q.     Do you know a Jessica Fryrear?

12      A.     Yes, sir.

13      Q.     Do you see her today?

14      A.     Yes, sir.

15      Q.     Would you point to her and tell us what she's

16  wearing?

17      A.     A white shirt.

18            BY MR. McCOU:  Your Honor, may the record

19    reflect that this witness has identified the

20    defendant Jessica Fryrear?

21            BY THE COURT:  Let the record so reflect.

22      Q.     Ms. Miller, how long have you known Jessica

23  Fryrear?

24      A.     Since I've been incarcerated, maybe five

25  years now.

1    Q.    How long have you known Eugene Sanders?

2    A.    For a long time.

3    Q.    More than 10 years?

4    A.    More than 10 years maybe, yes.

5    Q.    And how long have you known Roderick Payne?

6    A.    I don't know, about six maybe, who knows.

7          BY THE COURT:  I can't hear you.

8          BY THE WITNESS:  Maybe about six.  I knew G

9    before Bates.

10   Q.    Speak up, please.

11   A.    I'm sorry.  Yes, sir.

12   Q.    And you said you knew G before Bates.  Who is

13   G?

14   A.    Eugene.  I knew him before him.

15   Q.    And who is Bates?

16   A.    Roderick.

17   Q.    Ms. Miller, you are aware of why you're here

18   today?

19   A.    Yes, sir.

20   Q.    If you would, walk us through the events that

21   led up to your statement to the sheriff's office

22   regarding the events involving Frederick Formigoni's

23   death.

24   A.    Okay.  Well we were --

25   Q.    And speak clearly and slowly so the jury can

1    understand you.

2         A.    Okay.  So I'm not sure.  I know the event

3    happened at -- we went to Cleveland that day.  After we

4    went to Cleveland we went to Skeeter, Floyd Whittiker's

5    house.

6         Okay, Floyd Whittiker, and then I got out because

7    we mainly was just joyriding, so we went to find a truck

8    that my sister had.  We went to Skeeter's house after

9    that.  I went inside, talked to my sister and then we

10   left --

11                   BY AN UNIDENTIFIED JUROR:  Excuse us.  Can

12             she slow down and a little louder?

13                   BY THE COURT:  Slow down, please, and speak

14             into that microphone.

15                   BY THE WITNESS:  Okay.  After we went to

16             Cleveland we went to Skeeter's house which is Floyd

17             Whittiker.  When we pulled up at Floyd's I went in

18             and talked to my sister.  After I got back I went

19             back to the car and then we left.

20        Q.    While you were there did you say anything to

21   Floyd Whittiker or ask him anything?

22        A.    I don't recall if I did.  I don't recall.

23        Q.    Do you recall providing a statement to

24   Sergeant Adams and some other investigators with the

25   Washington County Sheriff's Office?

1    A.    I recall that, yes.

2    Q.    And do you recall telling them that you asked

3 Floyd to accompany you-all?

4    A.    No, sir, not as of now.

5    Q.    You do not recall that?

6    A.    As of now I don't, no, sir.

7    Q.    Do you recall saying that?

8    A.    I recall, yes, sir.

9    Q.    So to be clear, you recall saying that in the

10 statement but you don't recall actually saying that in

11 real life?

12    A.    It was all blurry then, too, because it's

13 been four years ago.

14    Q.    To your best recollection did you ask him?

15    A.    As my knowledge now, no, sir, I don't recall.

16    Q.    So you-all were at his house, you left, and

17 what happened?

18    A.    Then we went to Freddie Formigoni's house,

19 yes, and then --

20    Q.    Let me stop you.  You were at your cousin

21 Floyd's house.  Where was that house at?

22    A.    Behind Hoppers on Reed Road.

23    Q.    When you-all were there who all was present

24 in the vehicle with you?

25    A.    All four of us.

April Miller - Direct

9

```
 1          Q.      When you say all four of us, is that you plus
 2   the three defendants you've identified?
 3          A.      Yes, sir.
 4          Q.      And how long were you-all there?
 5          A.      It wasn't that long, no, sir.  I can't count
 6   the minutes but it wasn't long at all.
 7          Q.      And what route did you-all take?
 8          A.      The highway.
 9          Q.      Were there any stops anywhere in between --
10          A.      No, sir --
11          Q.      -- the house on Reed Road and Formigoni's
12   house?
13          A.      No, sir.
14          Q.      What route did you-all take to get there?
15          A.      We went to Reed Road down Highway 1 all the
16   way down.
17          Q.      Who was driving?
18          A.      Eugene.
19          Q.      Who was in the front passenger's seat?
20          A.      Me.
21          Q.      Who was behind the driver?
22          A.      Bates -- Roderick.
23          Q.      Who was behind you?
24          A.      No, no, no.  Roderick was behind me and
25   Jessica was behind Bates -- I mean G.
```

1       Q.    So y'all go directly from Floyd's house on

2  Reed Road to Formigoni's house on Metcalfe Road, and what

3  happened?

4       A.    We pull up, they get out.

5       Q.    When you say they?

6       A.    The two dudes, the two guys.

7       Q.    What are their names?

8       A.    Eugene and Roderick, they get out.  Me and

9  Fryrear, Jessica, was still in the car.

10      Q.    So the same four people that left Greenville

11  were the same --

12      A.    The same four people.

13      Q.    -- four people in the car.

14      A.

15      Q.    And for the court reporter, let me finish my

16  question.  She can only type what one of us is saying at

17  a time.

18      A.    Okay, I'm sorry.  Yes, sir.

19      Q.    The same four people that were on Reed Road

20  were the same four people at the house when y'all got to

21  Metcalfe Road?

22      A.    Yes, sir.

23      Q.    You said Sanders was driving.  Where did he

24  park when you-all got to the house on Metcalfe Road?

25      A.    We went to the highway and then it's like a

1    U-turn to point back at the highway.  So it was on the

2    side, it wasn't in the driveway or nothing.

3         Q.    You say U-turn.  Did y'all pull into that

4    driveway?

5         A.    No, sir, we didn't.  You know like when

6    you're on the highway you make a U-turn to pull through

7    the gravel, yes, sir.

8         Q.    And parked on --

9         A.    The side of the road basically.  The U-turn

10   was to the side of the road.

11        Q.    And did he park on the side of the road where

12   the house was or the opposite side?

13        A.    No.  It was where the house was.  It wasn't

14   the opposite side.

15        Q.    After he parked or put the car where it

16   stayed, how long before the two gentlemen got out?

17        A.    It wasn't long.  They just got out.

18        Q.    Immediately --

19        A.    Pulled and got out, yes.

20        Q.    And what did they do when they got out of the

21   car?

22        A.    They walked up there.  I don't know what they

23   did.  I stayed in the car.

24        Q.    So when they got out of the car you saw them

25   walk toward the house?

1      A.     Yes.  They just got out and walked toward the
2  house, yes, sir.
3      Q.     And once they walked toward the house, what
4  do you remember happening then?
5      A.     I just remember sitting in the car.
6      Q.     How long were you sitting?
7      A.     I can't count the minutes but it wasn't long,
8  yes, sir.
9      Q.     And then you were sitting in the car, and
10  what do you remember happening next?
11      A.     I was just sitting in the car and I do
12  remember hearing a gunshot, but I didn't really pay no
13  mind to it, yes, sir, and then they came back and we
14  left.
15      Q.     What did you do when you heard the gunshot?
16      A.     I didn't react.
17      Q.     What were you doing while you were waiting in
18  the car?
19      A.     Just waiting in the car.  I remember being on
20  the phone and dozing and dozing off and stuff, yes, sir.
21      Q.     And once you heard the gunshot, how long
22  between the gunshot and you said -- I believe you said
23  they ran back to the car?
24      A.     Well, being not in the right state of mind
25  that I was in, I can't tell you exactly the minutes, but

1    I can tell you it wasn't all that long.

2        Q.     What do you mean you weren't in the right

3    state of mind?

4        A.     Of course, I was on drugs but, you know.

5        Q.     What drugs were you taking?

6        A.     I took Xanax and I also did shoot up ICE

7    every now and then.

8        Q.     And how often would you do that?

9        A.     I took Xanax every day if I could find it.

10       Q.     And what about the -- you mentioned ICE?

11       A.     Yes, ICE.  I would take a shot everyday if I

12   could find a vein, but if I couldn't find a vein I just

13   wouldn't worry about it.  Xanax was my main thing.

14       Q.     Would you, in 2017, consider yourself an

15   addict at that point?

16       A.     Yes, sir.  I got out of rehab in 2017 in

17   January.  I stayed clean for maybe a few weeks and I got

18   back off -- on it, yes, sir.

19       Q.     And so once you saw them running back to the

20   car, did they get back in the same seats?

21       A.     Yes, sir, the same ones.

22       Q.     And did you see any one of them with

23   anything?

24       A.     No, sir, I did not.

25       Q.     Once they got back in the car did you-all

1   immediately drive off?

2       A.      Yes, sir.

3       Q.      Did you see anybody else out there?

4       A.      No, sir, I didn't.  I can't even remember the

5   car, no, sir.

6       Q.      What car were you in?

7       A.      We were in a gray Impala.

8       Q.      Who did that belong to?

9       A.      I think that belong to Eugene's dad.

10              BY THE COURT:  You're gonna have to be a

11          little bit closer to that microphone.

12      Q.      What kind of car were you in?

13      A.      Impala, a gray Chevy Impala.

14      Q.      And who did you know it to belong or think it

15  belong to?

16      A.      I think it belonged to Eugene's dad at that

17  time.

18      Q.      Do you recall in your statement to the

19  investigators at the sheriff's office that you recall

20  them being at the house for at least 10 minutes?

21      A.      No, sir.  I do recall saying at least 10

22  minutes, but I just averaged it out, estimated it, yes,

23  sir.

24      Q.      How many gunshots did you hear?

25      A.      Just one that I recall.

1    Q.    So when you were at Floyd's house -- let's go
2  back.  What would you have been asking him to come with
3  you-all to do?
4    A.    Mainly, probably to ride, but I don't recall,
5  no, sir.
6    Q.    You recall telling the investigators in your
7  statement that you-all had planned to rob Mr. Formigoni?
8    A.    Not at this time I don't recall it.
9    Q.    But you recall telling them in a statement in
10 2017?
11   A.    Yes, sir, I recall that, but as of now.
12   Q.    You say your memory is better now or in 2017?
13   A.    It's not.  I'm working off four years of
14 memory.
15   Q.    My question is would you say your memory is
16 better now or was it better in 2017?
17   A.    It's better now.  If anything would happen I
18 would remember it now.
19   Q.    So if I were to ask you if you recall any
20 conversation in the truck as of now or in the car that
21 you-all were in, do you recall you-all having any
22 conversation?
23   A.    No, sir, there was no conversation that I
24 recall.
25   Q.    Do you know why you would have told the

1    investigators in 2017 that you-all planned to rob Mr.
2    Formigoni?
3         A.    At that time I was still sedated.
4         Q.    Did anybody tell you to say that?
5         A.    No, sir.
6         Q.    And you mentioned the gunshot.  Did you see
7    anybody with a gun --
8         A.    No.  I knew Eugene always had a gun, but I
9    just didn't see him get out with one.  I just knew there
10   was one present.
11        Q.    Do you recall telling investigators you saw
12   him with one that day?
13        A.    Yeah, I seen one that day.
14        Q.    You did?
15        A.    Yes.
16        Q.    While you-all were riding around?
17        A.    Yes.
18        Q.    The same four people?
19        A.    Yes, sir.
20        Q.    What color was it?
21        A.    It was silver that I recall.
22        Q.    Do you recall giving any other statements to
23   the sheriff's office other than the one I've been
24   referencing from October 27th?
25        A.    No, sir.

1    Q.    Do you recall going to the scene with them in
2    one of their vehicles?
3    A.    Is that what I just told you about?
4    Q.    The sheriff's office showing them?
5    A.    I recall that, yes, sir.
6    Q.    And do you recall at that point also telling
7    them that you-all had planned to rob Mr. Formigoni?
8    A.    No, sir, I don't recall that.
9    Q.    Did you know Mr. Formigoni?
10   A.    No, sir.
11   Q.    Had you ever seen him or known of him?
12   A.    I seen him one time.  I went there with a
13   deceased man named Rob Dawkins, and I stayed in the truck
14   and he got out and talked to him at the hood of the
15   truck.  I didn't meet him.  He didn't lay eyes on me, I
16   didn't lay eyes on him, yes, sir.
17   Q.    Did anyone else other than Mr. Sanders have a
18   gun that you saw that day while y'all were riding?
19   A.    No, sir, not that I recall.  No, sir, I
20   didn't see anything.
21   Q.    Just so that we're clear, you recall in your
22   statement telling them that you-all planned to rob him in
23   the statement?  Yes?
24   A.    Somewhat, yes, sir.
25   Q.    But you're saying now you don't recall saying

1    that or don't --

2         A.    It's all blurry.  I just don't recall as of

3    now, yes, sir.

4         Q.    And you're saying that you think your memory

5    today would be better than your memory at the time?

6         A.    Yes, sir, way better today as of today.

7         Q.    I asked you earlier, when you gave them this

8    information that you asked Floyd to come with y'all --

9         A.    No, sir.

10        Q.    -- did anybody tell you to say that?

11        A.    No, sir, they did not.

12        Q.    Did anybody at the sheriff's office or any

13   other person tell you to say that you-all planned to rob

14   him?

15        A.    No, sir.  Can you repeat that?

16        Q.    Did anybody at the sheriff's office or

17   anybody else, any person that you know tell you to tell

18   the sheriff's office about the robbery?

19        A.    No, sir.

20        Q.    Did anybody, a member of the sheriff's office

21   or any other person that you know tell you at the time to

22   tell them that Eugene and Roderick are the ones that got

23   out?

24        A.    No, sir.

25        Q.    Did any member of the sheriff's office or

1    anybody else tell you to say in 2017 that you observed

2    Mr. Sanders with a gun?

3         A.    No, sir.

4         Q.    You mentioned that you were taking, I

5    believe, Xanax and ICE back in 2017 around this time.

6    Would those cause you to -- those are not hallucinogens,

7    are they?

8         A.    No, sir.  Xanax is for depression and ICE is

9    mainly an upper.

10        Q.    So they wouldn't cause your brain to create

11   memories that didn't occur?

12        A.    No, sir.  It might make you forget something,

13   but.

14        Q.    Just as I asked you about the statement you

15   made then, I'll ask about what you're saying now.  Has

16   anybody told you to say that your memory is better now

17   than it was?

18        A.    No, sir.

19        Q.    Did either of these defendants or any member

20   of the sheriff's office or any other person told you to

21   say that you don't recall making these statements?

22        A.    No, sir.

23        Q.    What has led you to say that you believe your

24   memory is better now than it was in 2017?  What, is that

25   a thought you had?

1      A.     Yeah, it's just what I believe.  Like say for

2  instance, I'll remember this more now than I was on

3  drugs, you know, yes, sir.

4      Q.     But you don't deny giving this statement and

5  saying those things?

6      A.     I don't.  I said it.

7      Q.     Was there any, between Reed Road and the

8  Formigoni house on Metcalfe Road, do you recall any

9  conversation?

10     A.     No, sir.

11     Q.     Do you recall telling the sheriff's office,

12  other than the plan to rob, there was any developed

13  ongoing conversation?

14     A.     No, sir.

15     Q.     What about on the ride back what did you-all

16  talk --

17     A.     No, sir, no conversation.

18     Q.     Where did y'all go after they got back in the

19  car?

20     A.     If I recall right, I think I was staying with

21  a person named Gene.  I think I got dropped off there,

22  but I know I ended up back at Skeeter's house, Floyd

23  Whittiker's house.

24     Q.     Do you recall going directly from the

25  Formigoni house to that house?

April Miller - Cross

1    A.    If I recall right. I know I ended back up at

2  Skeeter's house that night.

3    Q.    Based on your statement that you believe that

4  your memory of it now is better than it was in 2017, do

5  you have any idea why in 2017 you would have told the

6  sheriff's office that you four, these three including

7  you, went to rob Mr. Formigoni and that they got --

8    A.    Other than the -- sir?

9    Q.    And that these two, Sanders and Payne got out

10 to do it?

11    A.    I don't recall, but I know if I said it it's

12 true, yes, sir. If I said it at that time it's true but

13 as of now, you know, I'm working off four years of

14 memory, so.

15            BY MR. McCOU:  Tender, your Honor.

16            BY THE COURT:  Ms. Rodgers?

17 <u>CROSS-EXAMINATION BY MS. RODGERS</u>:

18    Q.    Good morning, Ms. Miller.

19    A.    Good morning.

20    Q.    My name is Trish Rodgers, I'm Patricia

21 Rodgers, and I represent Jessica Fryrear. I have several

22 questions that follow up to what you've just testified

23 to. You stated that you have known Jessica Fryrear at

24 this point in time for five years, is that correct?

25    A.    Yes, ma'am.

April Miller - Cross

1    Q.    And so if we subtract the four years --

2    A.    Of being incarcerated, yes, ma'am.  That

3  means I would have known her for at least -- I think I

4  met her around April or May, if I'm being correct.  I

5  know I met her in 2017.

6    Q.    You met her in April or May of 2017, is that

7  what you're saying?

8    A.    Yes, because she stayed at my house for a

9  little while.

10   Q.    So a little over four years you've known Ms.

11 Fryrear then, is that correct?

12   A.    Yes.  I just added the whole 2017 as five

13 years.

14   Q.    I understand.  So you met her in April or

15 May.  Did you and Jessica ever live in the same house?

16   A.    She stayed with me, yes, ma'am.  I can't

17 recall if it was a few days, few weeks.  Yes, ma'am, she

18 stayed with me.

19   Q.    What time period was that?

20   A.    I think I had my house like in May -- no, I

21 got it in April and I think I moved out of it in like

22 July.

23   Q.    So do you remember whether it was April, May,

24 June or July?

25   A.    No, ma'am, I can't recall, but I know it was

April Miller - Cross

1    around that time.

2         Q.    And you said you can't recall if it was days

3    or weeks that she lived there, is that correct?

4         A.    Yes, ma'am.

5         Q.    But she definitely lived there, is that

6    correct?

7         A.    Yes, ma'am.

8         Q.    Did she pay you rent?

9         A.    No, ma'am.

10        Q.    You just let her live there?

11        A.    Yes, ma'am.

12        Q.    And you and Jessica did drugs together, is

13   that correct?

14        A.    Yes, ma'am.

15        Q.    And if you don't mind, let me finish so that

16   the court reporter is not having to take down both of us

17   at the same time.

18        A.    Yes, ma'am, sorry.

19        Q.    So at any point did you and my client, Ms.

20   Fryrear, have an argument or a falling out?

21        A.    No, not really, no, ma'am.

22        Q.    So nobody ever had to come to your house and

23   remove her from your house?

24        A.    No, ma'am.  She left.

25        Q.    She left?

April Miller - Cross

1     A.    Yes.

2     Q.    Who helped her leave?

3     A.    I don't know.  When I woke up one day she was

4  gone.

5     Q.    Really?

6     A.    Yes, ma'am.

7     Q.    Did y'all speak after that?

8     A.    Not really.

9     Q.    So when was that that she moved out?

10     A.    In between that period of April and May.  I

11  can't recall the exact date.

12     Q.    So it would have been April or May that she

13  moved out?

14     A.    Yes, ma'am.

15     Q.    One of those two months?

16     A.    One of those two.

17     Q.    And this was in 2017?

18     A.    Yes.

19     Q.    Did she move out on good terms or bad terms?

20     A.    I can't recall if it was good or bad.  As of

21  now I don't have any feelings about it if it was good or

22  bad.

23     Q.    Did y'all speak after that?

24     A.    Not really.

25     Q.    So do you recall on the night of July 19th

April Miller - Cross

1    messaging her and asking her to meet you at Double Quick?

2         A.    No, ma'am.

3         Q.    You don't recall that?

4         A.    No, ma'am.

5         Q.    So it's your testimony here today under oath

6    that that never happened?

7         A.    Yes, ma'am.  I don't recall her meeting me at

8    Double Quick.  I do recall one night that she texted me

9    and asked me to give her a ride and she would meet me at

10   Double Quick, but that's not on that same night.

11        Q.    And so other than that communication after

12   she moved out in April or May, did y'all talk at any

13   point in time?

14        A.    Not until that one night that you just

15   brought up at Double Quick, but I don't think it was that

16   night at all.  It was not that night.

17             She texted me and asked me -- we were riding

18   around and she said, can you meet me, can you give me a

19   ride and meet me at Double Quick.

20             I said sure.  Well, we posted up like a street

21   above Double Quick and she was walking from it and we got

22   a bad feeling, so I blocked her off Facebook.  We never

23   picked her up.

24        Q.    So why did you get a bad feeling?

25        A.    I just had a bad feeling.  It was like 4

April Miller - Cross

1    o'clock in the morning, and then I seen another truck
2    riding by and just blocked her and didn't even worry
3    about it no more.
4         Q.    And when did that happen?
5         A.    It was a night, it was close in June, but I
6    don't recall the exact night.
7         Q.    So other than that communication with Ms.
8    Fryrear, have you talked to her?
9         A.    No, ma'am.
10        Q.    So it's safe to say y'all were not friends,
11   is that correct?
12        A.    Not friends.  I would say associates, yes,
13   you know.  I didn't have any friends out there, so.
14        Q.    What is the definition of an associate?
15        A.    A person you talk to, you know, a person you
16   hang around, but as far as a friendship, no, ma'am.
17        Q.    But other than the communication via text
18   where you claim she asked for a ride, y'all didn't speak,
19   correct?
20        A.    No, ma'am.  Other than that, no, ma'am.
21   After I blocked her I didn't hear nothing from her until
22   that night.
23        Q.    Until what night?
24        A.    The night that this happened.
25        Q.    So what did you hear from her on the night

April Miller - Cross

1    that this happened?

2         A.    Nothing.  I didn't talk to her or nothing.

3         Q.    Do you know Donnie Williams?

4         A.    I do know him.

5         Q.    How do you know Donnie?

6         A.    I just know Donnie because being around a lot

7    of people.

8         Q.    When did you meet Donnie?

9         A.    I can't recall a time, the exact time I met

10   him, but I've known him for a while, yes, ma'am.

11        Q.    How long have you known him?

12        A.    I can't recall the exact time, but it has

13   been years that I've known Donnie.  I've known Donnie for

14   a while.

15        Q.    Have you ever been in a relationship with

16   Donnie?

17        A.    No, ma'am.

18        Q.    And did you see Donnie Williams on July 19th,

19   2017?

20        A.    No, ma'am.  I hadn't seen Donnie in a long

21   time.

22        Q.    Do you know Christy Moore?

23        A.    I do know her.

24        Q.    How do you know Christy Moore?

25        A.    I know Christy because I think in 2016 me and

1    her had a little altercation but, you know, as far as

2    being friends with Christy I didn't get along with her or

3    anything, so.

4        Q.    Did you know that Christy Moore was present

5    in the house at the time of the murder?

6        A.    No, ma'am.

7        Q.    And are you aware at this point that there

8    were two gunshots in the house and not one?

9        A.    No, ma'am.

10        Q.    You're not aware of that?

11        A.    I am not aware of it, but I do know I heard

12    one, so.

13        Q.    So you heard one but you didn't hear the

14    other, is that correct?

15        A.    No, ma'am.

16        Q.    So is today the first time that you've heard

17    that there were two gunshots inside the house?

18        A.    Yes, ma'am.

19        Q.    And you said that y'all went to Cleveland

20    that day, is that correct?

21        A.    Yes, ma'am.  It was earlier.

22        Q.    Approximately, do you know what time y'all

23    went to Cleveland?

24        A.    No, ma'am.

25        Q.    Was that morning or afternoon?

April Miller - Cross

1          A.      Afternoon.

2          Q.      And what did y'all do in Cleveland?

3          A.      Well, we mainly was just joyriding.  My

4    sister had told me about a truck that her ex-boyfriend

5    had took from her and we went and found it.

6          Q.      So y'all went there to investigate the theft

7    of a vehicle?

8          A.      No, it wasn't investigating, no, ma'am.  We

9    were just looking for it.

10         Q.      Did you find the vehicle?

11         A.      We did.  I don't recall where it was but I

12   remember we found it on the road behind the trailer, so.

13         Q.      What did you do after you found the vehicle?

14         A.      Nothing, just came back and went to Floyd's

15   house.

16         Q.      And your sister was at Floyd's house, is that

17   right?

18         A.      Yes, ma'am.  She was in the bed.

19         Q.      Did you report to your sister that you found

20   the vehicle?

21         A.      I did.

22         Q.      Did you see Rob Dawkins while you were in

23   Cleveland?

24         A.      Rob Dawkins was deceased.  I think he died

25   the night before of an overdose I had heard.

April Miller - Cross

1   Q.   Have you ever done drugs with Rob Dawkins?

2   A.   Yes, ma'am.  One night we all partied and

3   Christy was actually there, yes, ma'am.  That's the night

4   me and Christy had that altercation.

5   Q.   Okay.  The same night you were with Rob you

6   and Christy had an altercation?

7   A.   Yes, but that was way, way, way before any of

8   this, and that was the year before in 2016.

9   Q.   Okay.  It's your testimony you've only been

10  with Rob one time?

11  A.   No, actually twice.  He came to my house and

12  I went with him to Freddie's house.  That's when I said I

13  was in the back seat.  He didn't look at me, I didn't

14  look at him.  He got out and talked to Mr. Freddie at the

15  hood of the truck.  So it was twice I met with Rob, the

16  first night with Christy and then that day in 2017.

17  Q.   Okay.  What did Rob go to Freddie's house

18  for?

19  A.   I have no idea.  Like I said, I stayed in the

20  truck, he got out and they talked at the hood of the

21  truck and he got back in and I went to my house.  Rob was

22  just at my house and he asked did I want a ride and I was

23  like, sure, I'll ride to Cleveland with you.

24  Q.   And what did you and Christy have a falling

25  out about?

April Miller - Cross

1       A.    I think it was something about stealing

2  something from her or something like that.  I don't know,

3  but we had a falling out, and it was all over Facebook,

4  but it was really nonsense.

5       Q.    And Christy would have been dating Mr.

6  Formigoni at the time, correct?

7       A.    I have no idea.

8       Q.    So you went to Freddie's house with Rob

9  approximately how long before the murder took place?

10      A.    I can't tell you.  Probably a month or so.  I

11  I don't know, I can't recall.  Yes, ma'am, I can't

12  recall.

13      Q.    And it was just you and Rob?

14      A.    And another person named Jok.

15      Q.    Another person named who?

16      A.    Jok, J-o-k.

17      Q.    What's Jok's real name?

18      A.    I have no idea.  I just know his nickname.  I

19  don't even know him.

20      Q.    Okay.  So you just rode and you have no idea

21  why Rob went to Freddie's house?

22      A.    No.

23      Q.    So when he got back to the vehicle, he didn't

24  explain why he was there?

25      A.    No, ma'am, he didn't.

1   Q.  And you said when y'all left y'all all drove

2 out here, you said y'all made a U-turn --

3   A.  In the highway, yes, ma'am, to point towards

4 the highway facing back the same way we just came from.

5   Q.  And you said you do recall the video that --

6   A.  I recall that, yes, ma'am.

7   Q.  Do you recall in that video telling

8 investigators that y'all pulled in the driveway and then

9 backed out of the driveway to turn around and face the

10 other way?

11   A.  No, ma'am.

12   Q.  You don't recall that?

13   A.  No, ma'am.

14   Q.  But it's your testimony you made a U-turn?

15   A.  Yes, ma'am.

16   Q.  So how much Xanax did you take that day?

17   A.  I can't recall, but I do know that I at least

18 took three or four to feel normal because at that time I

19 was addicted to them, yes, ma'am.  And you know,

20 withdrawals.

21     BY MR. GORE:  I'm sorry, your Honor.  I

22   can't hear.

23     BY THE COURT:  You must speak into the

24   microphone more clearly.

25     BY THE WITNESS:  At that time I took three

April Miller - Cross

1    or four maybe to feel normal because I was addicted

2    to Xanax, so I had to.  To not withdraw I had to

3    take that, yes, ma'am.

4       Q.    I understand.  So that was an everyday thing

5    for you?

6       A.    Yes, ma'am.

7       Q.    So that you wouldn't experience those

8    withdrawals, correct?

9       A.    Yes, ma'am.

10       Q.    And so that's how you functioned on a

11   day-to-day basis, correct?

12       A.    Yes, ma'am, back then.

13       Q.    And were you able to take care of your

14   everyday business while you were on Xanax?

15       A.    Yes, ma'am.  I mean, I paid my rent, you

16   know.

17       Q.    So did you have any more than three or four

18   Xanax that day?

19       A.    I can't recall.  Like I said, I just took it

20   on a normal day.  So that day I can't recall how many I

21   did take.

22       Q.    Do you remember being especially high that

23   day?

24       A.    Not that I recall, no, ma'am.

25       Q.    So you have a memory of this day, correct?

1      A.      Yes, ma'am, somewhat.

2      Q.      And you specifically remember there being

3  only one gunshot, is that your testimony?

4      A.      That I can recall, yes, ma'am.

5      Q.      Have you ever been in a vehicle before when

6  an individual or individuals got out, went to a house and

7  shot a gun and then came back to the vehicle that you

8  were in, has that ever happened to you before?

9      A.      I mean, like maybe if they were going to go

10 buy one or something like that, you know, to test it out

11 in the country or something, yes.  But other than that,

12 no.

13     Q.      So you've never been in this same situation

14 before?

15     A.      No, ma'am.

16     Q.      Would you say that this is a pretty irregular

17 incidence?

18     A.      Yes, ma'am.

19     Q.      Life changing, correct?

20     A.      Yes, ma'am.

21     Q.      And was it startling for you to hear that

22 gunshot?

23     A.      At that time, you know, but I know my place,

24 stay to yourself, you know, so.

25     Q.      So you just hear one gunshot.  You're saying

1    that the two guys came back to the vehicle and nobody

2    says a word?

3         A.    Nobody says anything that I recall.

4         Q.    And when did you find out that Mr. Formigoni

5    was deceased?

6         A.    Well, that I recall I did hear it on the news

7    afterwards, but Detective Evans did call me and asking me

8    about a murder, and at that time I had thought in my head

9    I had heard stories that Rob Dawkins had got murdered.

10        So I figured he might have been talking about him

11   but he wasn't, and he didn't make hisself clear.  I said,

12   I know of somebody who died last night, and then after

13   that occasion I found out on the news.  My friend, you

14   know, told me and stuff.

15        Q.    When did Gerald Evans call you?

16        A.    It might have been two days.  I don't know, I

17   can't recall, but I know he called and asked because I

18   was in Wal-Mart parking lot that night.

19        Q.    In July of 2017, how did you know Gerald

20   Evans?

21        A.    Gerald Evans used to always lock me up

22   because I used to always go and get grand larceny charges

23   and stuff.  So he was mainly the investigator on

24   everything, so.

25        Q.    Okay.  And so Gerald Evans is calling you for

April Miller - Cross

1    information?

2        A.    Yeah, questioning like he always does because

3    he always thinks I'm stealing something or stuff like

4    that, yes, ma'am.

5        Q.    So he assumed you were a suspect from the

6    very beginning?

7        A.    I assume, yes, ma'am.  I don't know where he

8    got his knowledge from, but I assume, yes, ma'am.

9        Q.    And you told him what?

10       A.    I told him I knew that Rob Dawkins had

11   passed.  That's who I thought he was talking about.

12       Q.    And how did you know that Rob Dawkins had

13   passed?

14       A.    Because he was at a friends's house of mine

15   in Cleveland and they told me.

16       Q.    And you were also in Cleveland that day,

17   correct?

18       A.    No, not that day, no, ma'am.  The day Evans

19   called me, no, ma'am.

20       Q.    No.  The day that Rob Dawkins died, you were

21   also in Cleveland, correct?

22       A.    No, ma'am.  I heard that he had died the

23   night before or something like that.

24       Q.    Have you ever administered drugs to Rob

25   Dawkins?

1    A.    No, ma'am.  Administered, you mean as gave
2  him drugs?
3    Q.    Shoot him up.  Did you ever shoot him up?
4    A.    No, ma'am.  I didn't even know that he shot
5  up, and at that time I knew he was on heroin, and I
6  didn't do heroin, so.
7    Q.    When you said you left the scene and went to
8  Gene's house, what's Gene's full name?
9    A.    I can't recall his full name as of now.
10    Q.    Gene Long, correct?
11    A.    Yeah, that's probably it, yes, ma'am.  He
12  worked at Toyota.
13    Q.    And so you went directly from the murder
14  scene to Gene Long's house, correct?
15    A.    As I said, I recall I might have went to
16  Gene's, but I know I ended up at Skeeter's, so.
17    Q.    So you don't remember?
18    A.    I can't recall just correctly.
19    Q.    How did you know Gene?
20    A.    Just a longtime friend, you know, I just knew
21  of him.  He did drugs.  He was around the circle, you
22  know.
23    Q.    Did you tell investigators that you went from
24  there to Gene's house?
25    A.    Not that I recall.

April Miller - Cross

1   Q.   So going back to your relationship with Ms.
2   Fryrear. You told the jury that y'all didn't speak, you
3   and Ms. Fryrear didn't speak except for the one time you
4   claim she texted you and asked for a ride?
5   A.   Yes, ma'am.
6   Q.   But then you want the jury to believe she
7   ended up in the car with you during a murder?
8   A.   Yes, ma'am. She was in the car with me
9   during that.
10  Q.   What did y'all talk about?
11  A.   Nothing.
12  Q.   And what's your knowledge of the relationship
13  between Donnie Williams and Freddie Formigoni?
14  A.   I have no idea. The only knowledge that I
15  have is that Christy Moore is Donnie's sister and that's
16  how I figure that they are connected, yes, ma'am.
17  Q.   So how did Jessica get in the car that night?
18  A.   She was with Roderick.
19  Q.   She was with Roderick Payne?
20  A.   Yeah. We all met up at Eugene's house.
21  Q.   Where is Eugene's house?
22  A.   Off Reed Road.
23  Q.   How did she get there?
24  A.   I don't know. They were there when we got
25  there.

April Miller - Cross

1       Q.     When who got there?

2       A.     Me and Gene, we arrived there.  I don't know

3 where we went, but.

4       Q.     And so you and Eugene are gone somewhere and

5 when you get back Jessica is at his house?

6       A.     Uh-huh.

7       Q.     This is the same Jessica you aren't on

8 speaking terms with, correct?

9       A.     Uh-huh.  I didn't have a problem with her,

10 you know what I'm saying.

11       Q.     Well, why did you block her on Facebook?

12       A.     Because I didn't want no dealings with it,

13 whatever I thought she had going on that night.  You

14 know, of course, when you're on drugs you get spooked.

15 So I got spooked, didn't want no dealing with it, I

16 blocked her.

17       Q.     But you weren't spooked when you were --

18 you're telling the jury you were in a car with her,

19 correct?

20       A.     Yes, ma'am.

21       Q.     Was Donnie Williams in the car that night?

22       A.     With us, no, ma'am.

23       Q.     How far does Donnie Williams live from

24 Freddie Formigoni?

25       A.     I have no idea.  Like I said, I didn't deal

April Miller - Cross

1   with Donnie, I just know him.

2       Q.      Have you ever been with Donnie?

3       A.      No, ma'am.

4               BY MS. RODGERS:  Court's indulgence for a

5           moment.

6               BY THE COURT:  Very well.

7       Q.      Isn't it true, Ms. Miller, that the day y'all

8   actually went to Cleveland, you and Ms. Fryrear together,

9   was back in April when y'all lived together?

10      A.      No, ma'am.

11      Q.      That's not true?

12      A.      No, ma'am.  If we went to Cleveland then,

13  yeah, we probably did ride to Cleveland then, but it

14  wasn't for that occasion.

15      Q.      Y'all didn't go looking for the truck that --

16      A.      Not then, no, ma'am.  Not at that time in

17  April, no, ma'am.

18              BY MS. RODGERS:  Nothing further.

19              BY THE COURT:  Do you tender?

20              BY MS. RODGERS:  Yes, sir.

21              BY THE COURT:  Mr. Littleton?

22              BY MR. LITTLETON:  May it please the Court?

23              BY THE COURT:  You may proceed.

24  **CROSS-EXAMINATION BY MR. LITTLETON:**

25      Q.      Ms. Miller, my name is James Littleton and I

1    represent Roderick Payne for which we're here today.  You

2    indicated that you went to Floyd's house on the day this

3    incident occurred.  You remember the date of this

4    incident?

5         A.    No, sir.  It was in July.  Now that I know

6    now y'all say July 19th, yes, sir.

7         Q.    But you indicated you went to his house.  Did

8    you at any point ask him to participate?

9         A.    Ask Floyd?

10        Q.    Yes.

11        A.    Not that I recall right now.

12        Q.    You're not saying that you didn't, you're

13   just saying you don't recall?

14        A.    I don't recall, yes, sir.

15        Q.    And what time would that have been?

16        A.    It was night because when we went to

17   Cleveland it was the evening.  So it was night, yes, sir,

18   and I consider night being after 12:00, too.  When it's

19   dark that's what I consider night, too.

20        Q.    So you consider it to be dark?

21        A.    Yes, sir.

22        Q.    Dark could have been earlier like 8:00, 9:00,

23   10:00?

24        A.    It was a little bit more, I think.

25        Q.    You mean a little bit later?

1      A.      Yeah, a little bit later, yes, sir.

2      Q.      But you're not aware of how long?

3      A.      Not aware of the time.

4      Q.      And it's your contention y'all left there and

5  went down Highway 1 and went out to Mr. Formigoni's

6  house?

7      A.      Yes, sir.

8      Q.      And you indicated you had been to Mr.

9  Formigoni's house before, correct?

10     A.      One time.

11     Q.      So you knew where he lived?

12     A.      I knew, yes, sir.

13     Q.      Now, when you went with the ride with the

14  investigators, we could hear you ask which house is Mr.

15  Formigoni's house.

16     A.      It was nighttime and I didn't really pay

17  attention.  It was nighttime when we were riding.

18     Q.      It was nighttime when you were riding --

19     A.      When we all were together, yes, sir.

20     Q.      And who is we are you referring to?

21     A.      All four of us.

22     Q.      But it was daytime when you went with the

23  investigators?

24     A.      Yes, sir.

25     Q.      And you had been out there before, right?

April Miller - Cross

1    A.    Yes, sir.  Like I said, I had been out there
2  before, but when I was with Rob I really didn't pay
3  attention to where -- you know, the location there.
4  There are three or four houses there, so.
5    Q.    When you went with the investigators why did
6  you ask which --
7    A.    I was in the back seat --
8    Q.    Let me finish, ma'am, and then you can
9  answer.  We're not gonna do this back and forth, okay.
10  When you went with the investigators out to his house,
11  why did you ask the investigator which house is it?
12    A.    I didn't ask them.  I was thinking out loud
13  and I rose up from the back seat to look.
14    Q.    What time did you get to Mr. Formigoni's
15  house?
16    A.    Which occasion are you talking about?
17    Q.    On the night you allege you were with these
18  people?
19    A.    I can't recall the exact time, but I know it
20  was dark.  It was late.
21    Q.    And how long from the time you're out there
22  until y'all left?
23    A.    It wasn't long.
24    Q.    So you don't know what time you got out
25  there, you don't know if it was 12 o'clock, 2 o'clock, 5

April Miller - Cross

1    o'clock?

2         A.    I was past 12:00 I do believe, but I can't

3    just put an exact name on it.

4         Q.    You don't know what time?

5         A.    Not exactly.

6         Q.    Would it have been before 4 o'clock?

7         A.    It probably was.  It was late.  Like I said,

8    it was late and it was night, so.

9         Q.    But would it have been before 4 o'clock?

10        A.    It might have been around that area.

11        Q.    You think it may have been before 3 o'clock?

12        A.    I don't recall, sir.

13        Q.    Where did y'all park?

14        A.    On the side of the road.

15        Q.    Are you familiar with the -- had it rained

16   out there?

17        A.    Not that I know of.  I can't recall.

18        Q.    You don't recall it having rained?

19        A.    No, sir.

20        Q.    Isn't the road kind of sloped out there?

21        A.    I assume.  I don't know.

22        Q.    You say y'all parked on the side of the road?

23        A.    On the side of the road.  It's one road.

24             BY MR. LITTLETON:  Court indulge me for

25        just a second?

1      BY THE COURT:  Very well.

2      BY MR. LITTLETON:  Your Honor, may I

3   approach?

4      BY THE COURT:  You may.

5   Q.    Can you identify those photos after you have

6   a chance to look at it?

7   A.    Yeah, this is the house.  No, this looks like

8   --

9      BY MR. GORE:  Your Honor, could she speak

10   into the mike?

11      BY THE COURT:  Yeah.  You must speak into

12   the microphone.

13      BY THE WITNESS:  I'm sorry.  I'm looking at

14   them.  They look familiar, yes, sir.

15   Q.    And would you tell us what is depicted in

16   those photos that you have?

17   A.    If I'm not mistaken this is the house.

18      BY THE COURT:  Ma'am, you've got to speak

19   into the microphone.

20      BY THE WITNESS:  If I'm not mistaken this

21   is the house.

22   Q.    Can you look at those photographs and tell me

23   what --

24   A.    I don't think this is the house to be honest

25   with you.

April Miller - Cross

1          BY MR. LITTLETON:  Does the State object to

2      those photos?

3          BY THE WITNESS:  I really can't recall, you

4      know what I'm saying.  I've only been there a few

5      times and I just didn't -- you know.

6      Q.    You can't identify that house, is that what

7  you're telling this Court?

8      A.    I know for a fact this is not the house right

9  here.

10     Q.    What about the photo with the house on it?

11     A.    From what I remember or recall the time I

12  went with Rob Dawkins, the slope, it was concrete and not

13  gravel, and that's just basing off memory, you know, so.

14     Q.    So you don't recall specifically that photo?

15     A.    Like I said, it was nighttime and this does

16  look like it's the road, yes, sir.

17     Q.    Do you see a camper in that photo?

18     A.    I see a camper right in the back, yes, sir.

19  Did I see a camper that night, no, sir.

20     Q.    You can't remember that house?

21     A.    I can't remember that camper but it looks

22  like that's on the same road.  I can't just off the top

23  and tell you what his house looks like.  I know where

24  it's at.  I know the location.  It's not like I went in

25  the house, you know.

April Miller - Cross

1      Q.      I'm gonna leave this with you because I'm
2   gonna ask you some questions.  Do you recall telling
3   investigators there was a long driveway leading up to
4   this house?
5      A.      If I recall right it's a driveway.  I don't
6   recall saying it was long, but.
7      Q.      You see this photograph?
8      A.      I see it right here.
9      Q.      And you went there in the daytime with
10  investigators, right?
11     A.      Yes, sir.
12     Q.      So it wouldn't have been nighttime, correct?
13     A.      Yes, sir.
14     Q.      And you said your memory is better now than
15  it was at that time, correct?
16     A.      Yeah, but I barely can remember things back
17  then.  Like I said, my memory is better now because I'll
18  remember this right here better than I would have right
19  if it happened back then.
20     Q.      Were you high on the day that you gave
21  investigators a statement?
22     A.      Well, no, sir.  I didn't take anything in
23  jail, but I probably still could have been coming down
24  off things to be honest with you.  Who knows.  I'm not
25  sure how long, you know.

48

April Miller - Cross

1    Q.    And you would have given that statement
2  October 27 of 2017?
3    A.    October 27th, that's when this happened or
4  that's when they took me to this place you saying, or is
5  that when I gave them the statement and got locked up?
6    Q.    When you gave the statement.
7    A.    Yes, sir.
8    Q.    You would have been high at that time?
9    A.    I was on things, but the night before when I
10  knew that I had to come to the sheriff's department I did
11  not do anything, I slept that night, but I still could
12  have been coming down off everything I had done.
13    Q.    Because you're high and you testified there's
14  a need for these drugs because you become withdrawn,
15  right, when you don't get Xanax, correct?
16    A.    Sometimes, yes, sir.
17    Q.    Will you do or say anything to get it?
18    A.    No, sir.
19    Q.    You won't lie to get it?
20    A.    Depends on to who, to be honest with you.
21    Q.    Will you steal to get it?
22    A.    I have.
23    Q.    Will you cheat to get it?
24    A.    Cheat as in what?
25    Q.    However you need to cheat to get it?

April Miller - Cross

1    A.    I would steal to get it but I also supported

2    my own habit.

3    Q.    It would be fair to say you would do just

4    about anything to get these drugs?

5    A.    I wouldn't say anything but I would do

6    things, yes, sir.

7    Q.    What type of things would you do?

8    A.    Well, I have had sex for money and got my

9    drugs, yes, sir.  I have stolen trailers to get money to

10   get drugs.

11   Q.    You ever been involved sexually with Roderick

12   Payne?

13   A.    I have.

14   Q.    What about Gerald Evans have you ever been --

15   A.    No, sir.

16   Q.    Let me finish my question.  Have you ever

17   been sexually involved with Gerald Evans?

18   A.    No, sir.

19   Q.    Have you ever been to the Budget Inn?

20   A.    Yes, sir, plenty of times.

21   Q.    You ever recall being at the Budget Inn with

22   Connie Raymond?

23   A.    No, sir, I don't recall, but she probably

24   could have stopped by the room with somebody.  It was

25   people coming by.

April Miller - Cross

1      Q.    So if she said she overheard you having a

2 conversation --

3           BY MR. McCOU:  Objection to the relevance

4   and the hearsay, your Honor.

5           BY THE COURT:  The objection is sustained.

6           BY THE WITNESS:  What does that mean?

7   Okay.  I would answer the question.

8      Q.    Now, would you agree there's a camper in this

9 photograph?

10      A.    I agree it is.  I see it in gray and white.

11      Q.    Would you agree there's a long driveway

12 leading up to the house?

13      A.    That is a pretty fair driveway but it's not

14 all that long.

15      Q.    You said y'all went out there.  Where did

16 y'all park?  Y'all pull in the driveway, pull up to the

17 house?

18      A.    It was on the side of the road.  If I'm not

19 mistaken, I recall making a U-turn and pointing towards

20 the same side we were coming from.

21      Q.    So you never got in the driveway?

22      A.    Not that I recall.

23      Q.    And you said you made a U-turn and you got on

24 the side of the road, and you're heading in which

25 direction?

1    A.    I would say South Highway 1, Highway 1 South.

2    The same way we came back from on Highway 1 is the same

3    way we were pointing out.

4    Q.    Is it fair to say --

5    A.    Oh, I don't know.  I don't know the north or

6    south --

7            BY THE COURT:  Wait a minute.  Let her

8        finish the answer.

9            BY THE WITNESS:  Sir?

10            BY THE COURT:  Are you through with your

11        answer?

12            BY THE WITNESS:  I don't know the north or

13        south ways but which way we came back from is the

14        way we pointed towards to go that way.

15            BY THE COURT:  You may proceed.

16    Q.    Well, let me ask you this:  Is that in the

17    direction of Metcalfe?

18    A.    Metcalfe, I thought we were in Metcalfe.

19    Q.    And you're on the side of the road.  You

20    don't recall the weather?

21    A.    I don't recall any weather, no, sir.

22    Q.    Wouldn't you agree that if it had rained it

23    would be difficult to park on the side of that road where

24    you allege you-all were?

25    A.    Not really, no, sir.  You can park anywhere

1    when it's raining if it ain't muddy.

2    Q.    That's my point.  It would have been muddy,

3    correct?

4    A.    I see grass right here.

5    Q.    You don't think you-all would have gotten

6    stuck?

7         BY MR. FRYE:  Your Honor, speculation.

8         BY THE COURT:  That objection is sustained.

9    Q.    You ever did drugs with Donnie Williams?

10   A.    No, sir.  I had been high around Donnie

11   Williams times but, no, sir, I never did drugs with him.

12   Q.    You indicated you knew him, right?

13   A.    I know him, yes, sir.

14   Q.    And how do you know him?

15   A.    I can't recall.  Just meeting him around.

16   It's a circle, everybody knows everybody.  You don't have

17   to hang out with anybody to know people.

18   Q.    I believe you were asked earlier by Ms.

19   Rodgers.  You're saying you did not get high with Rob

20   Dawkins the day before this incident occurred with Mr.

21   Formigoni?

22   A.    I was not with Rob Dawkins the day before.

23   Q.    You have these charges here in this court.

24   You've been promised anything of value?

25   A.    No, sir, I haven't.

1    Q.    So nobody has told you with the D.A.'s office
2    or the investigators that you're gonna get a leaner
3    punishment?
4    A.    No, sir.  I'm charged just like everybody
5    else.
6    Q.    Have you had any conversations with any
7    investigator about what you can expect as your punishment
8    for testifying here today?
9    A.    No, sir.
10   Q.    You have any other charges other than these
11   charges pending?
12   A.    No, sir, not that I know of I don't.  I think
13   I have a warrant in Greenville, but that's only because I
14   was incarcerated at the time I had a court date.
15   Q.    And you have no charges in Sunflower County?
16   A.    I had charges but I worked them out.
17   Q.    What were those charges in Sunflower County?
18   A.    I had some traffic tickets and stuff.
19   Q.    Any murder charge in Sunflower County?
20   A.    No, sir.
21   Q.    You indicate that you were dropped off at
22   Gene's.  Who is Gene?
23   A.    Gene was a friend I was staying with at that
24   time because I had lost my house, but I was staying with
25   him.

1  Q.     What's his real name?

2  A.     She just refreshed my memory.  It's Gene

3  Long.  She is correct after she refreshed my memory.

4  Q.     Where does he live?

5  A.     I don't know where he lives as of now, but at

6  that time he was staying a little bit off Raceway Road.

7  Q.     And why didn't you tell investigators this at

8  the time you were giving your statement?

9  A.     I don't recall.

10  Q.     So you do recall not telling them about Gene

11  Long?

12  A.     I do recall that.  I just was thinking.

13  Q.     And this is the first time today you told

14  anybody about Gene Long, correct?

15  A.     Yes, sir.

16  Q.     And you say he lives off of what, Raceway

17  Road?

18  A.     Raceway Road, yes, sir, a little bit by that

19  Shell Station.  I don't know if he lives there now, but

20  that's where he was living in 2017.

21  Q.     You have a phone number for him?

22  A.     No, sir, I do not.  And I said I recall that

23  I might have got dropped off at Gene's, but I know I

24  ended up at Skeeter's house, so I just don't recall

25  whether I got dropped off at any point.

1        Q.     So it's fair to say you don't really recall a

2   whole lot about that night or the events of that night,

3   correct?

4        A.     It's not fair to say that because I recall

5   these things I've been telling you.  It's just certain

6   things I don't recall because I just don't remember

7   everything.  I'm working off four years of memory.

8        Q.     So you're saying you remember --

9        A.     And a lot of drugs.

10       Q.     I'm sorry, we both can't talk.  Go ahead.

11       A.     You talk first.

12       Q.     So you're saying you remember some things but

13   you can't remember other things?

14       A.     I can't remember just everything, yes, sir.

15       Q.     And what affects your memory where you're

16   remembering some things and not other things?

17       A.     Well, the effect is I was high that night.

18       Q.     But I mean, you're still able to remember

19   some things.  Why is it that you're able to remember some

20   things and not other things at that time?

21       A.     You just don't remember everything.

22       Q.     Did you know where Donnie Williams was living

23   at the time of this incident?

24       A.     No, sir, not a clue.  Didn't even really hang

25   out with him, no, sir.

April Miller - Cross

1      Q.    Had you ever been to the trailer park where

2  he lived?

3      A.    What trailer park?

4      Q.    The trailer park down from Mr. Formigoni's

5  house?

6      A.    No, sir.  I don't know of any trailer park by

7  that house.

8      Q.    Where are you now?

9      A.    Where am I now?

10     Q.    Yes.

11     A.    I'm in jail incarcerated.

12     Q.    Where?

13     A.    I'm incarcerated in Sunflower County.

14     Q.    You eat steak and shrimp everyday?

15     A.    No, sir, I do not.

16     Q.    You don't eat steak and shrimp?

17     A.    I eat the county food that they serve us

18  everyday.  Three meals a day and I sleep at night.

19     Q.    They're not giving you good food?

20     A.    No, sir.

21          BY MR. McCOU:  Objection to relevance, your

22    Honor.

23          BY THE COURT:  Objection is sustained.

24     Q.    What were you wearing on the night this

25  incident occurred?

April Miller - Cross

1    A.    I cannot recall what I was wearing.  It may
2    have been some jeans or something, but I can't recall
3    what I was wearing.
4         Q.    What was Eugene Sanders wearing?
5         A.    I can't recall.
6         Q.    What was Roderick Payne wearing?
7         A.    Can't recall and can't recall on her.
8         Q.    You can't recall on Jessica Fryrear?
9         A.    No, sir.
10        Q.    You indicated that you got a call from Gerald
11   Evans about this matter?
12        A.    Yes, sir, I did.
13        Q.    And what did you tell him?  What did he ask
14   you and what did you tell him?
15        A.    Well, first I did not know how he got my
16   number, and when I answered the phone I was at Wal-Mart
17   parking lot, and not sure how many days after that, and
18   he said I need to know about a dude that got killed.
19        And I said, well, I do know a dude that got
20   killed and that was Rob, because at that time I thought
21   that he had died, but later I found out he had died of an
22   overdose.
23        And that's who I thought he was talking about.
24   And then I was like, I don't know what you're talking
25   about, and then that was the end of that conversation.

April Miller - Cross

1    Q.    And after then did Gerald Evans pick you up

2  and take you to Sunflower County?

3    A.    No, sir, he did not.

4    Q.    Who took you to Sunflower County?

5    A.    A deputy picked me up.

6    Q.    Which deputy picked you up?

7    A.    From Indianola.  His name was Woody Spencer.

8    Q.    So a deputy picked you up and took you to

9  Sunflower County?

10   A.    Yes, sir.

11   Q.    Why not to Washington County?

12   A.    I don't know.

13   Q.    It's particular if you don't know why they

14  took you to Sunflower County?

15   A.    No, sir.

16   Q.    You had no charges over there at that time?

17   A.    I'm sure I probably did, sir.  I did have a

18  warrant for me, but I have warrants everywhere.

19   Q.    How often would you talk to Gerald Evans?

20   A.    Just when I steal something he'll message me

21  or call or get my number somehow and be like, you got a

22  trailer, I want it.  Of course, I'll deny it and then

23  he'll end up catching me with the trailer and I'll get

24  stuck with a charge.  I'll bond out on it.

25   Q.    So he's called you a number of times about

April Miller - Cross

1    things that you've been involved with, correct?

2        A.    It's a number.  It's not a numerous number,

3    but it's a number of times, yes, sir.

4        Q.    So why were you surprised that he had your

5    phone number?

6        A.    Because I had changed it.  I had a different

7    number, I had a different phone.

8                BY MR. LITTLETON:  If the Court will

9        indulge me?

10               BY THE COURT:  Very well.

11       Q.    I want to revisit something.  Your offer to

12   testify, don't you have an agreement that as long as you

13   testify here today that you will receive some type of

14   treatment is that --

15       A.    No, sir.

16       Q.    So you weren't required to be here to testify

17   in this matter today?

18       A.    I was required to be here because it is my

19   charge at this trial.

20       Q.    Well, they're charged.  What makes you

21   different?

22       A.    I don't know.

23       Q.    What makes you special?

24       A.    I don't know.

25               BY MR. LITTLETON:  May I approach, your

1       Honor?

2                   BY THE COURT:   You may.

3       Q.      Can you look at that mailbox and make out

4  part of that address on that mailbox?

5       A.      No, sir, I can't see it.  It's dark.

6       Q.      You can't see the number on there?

7       A.      No, sir.

8       Q.      You can't tell that that's an 11?

9       A.      I see 1-1, but I also see other things under

10  there that I can't see.

11      Q.      Do you know Mr. Formigoni's address?

12      A.      No, sir, I don't.

13      Q.      If I told you it was 1177, would you have a

14  reason to disagree with that?

15      A.      No, sir.

16      Q.      And you said on this mailbox there is an 11,

17  correct?

18      A.      Yes, sir, I see two ones.

19      Q.      And you're not saying that this is not his

20  house, you just don't remember, correct?

21      A.      I just can't recall.  I'm sure if I go in

22  that area I can point it out but, no, I can't recall.

23      Q.      You recall giving a statement October 27,

24  correct, 2017?

25      A.      I don't know the exact date, but I recall

April Miller – Cross

1    being locked up and talking to them, yes, sir.

2        Q.    Do you recall telling investigators there

3    were no campers and no vehicles at that location?

4        A.    No, sir, I don't recall.

5        Q.    You don't recall?

6        A.    No, sir.

7        Q.    If I were to allow you to listen to your

8    statement, would that help to refresh your recollection?

9        A.    I've listened to it, and if I said it then it

10   must have been true, but I don't recall as of now.

11       Q.    Just a quick question.  If I were to allow

12   you to listen to it, would that refresh your

13   recollection?

14       A.    Yes, sir.

15       Q.    And in the photo that I showed you you saw a

16   camper, correct?

17       A.    I did see a camper, yes, sir, but it was also

18   dark, too, so.

19               BY MR. LITTLETON:  Your Honor, at this time

20          we would like to refresh her recollection.

21               BY THE COURT:  Do you have a transcription

22          of that statement that you could show her?

23               BY MR. LITTLETON:  No, your Honor, but we

24          do have a video.  We had some difficulties

25          yesterday but we've switched computers.

1          BY THE COURT:  I don't want to take time

2     out of the trial because we've already demonstrated

3     that that's very hard to do and it takes so much

4     time that I don't want to do that.  So I'll deny

5     that request at this time.

6          BY MR. LITTLETON:  And again, your Honor,

7     we did switch computers.

8          BY THE COURT:  I understand that, but it

9     takes so long to get the jury out and get them

10    back.  It just takes too much time.

11         BY MR. LITTLETON:  I understand.

12         BY THE COURT:  Anything further?

13         BY MR. LITTLETON:  I tender, your Honor.

14         BY THE COURT:  Very well.  Mr. Gore?

15         BY MR. GORE:  Thank you, your Honor.  May I

16    proceed, your Honor?

17         BY THE COURT:  You may.

18    <u>CROSS-EXAMINATION BY MR. GORE</u>:

19    Q.    Ms. Miller, I'm Tucker Gore and I represent

20    Eugene Sanders.  Now, you've known Eugene a good long

21    time, correct?

22    A.    Yes, sir.

23    Q.    Know each other from Leland, that sort of

24    thing.  And back in 2017 starting in about February or

25    March, you and Eugene started hanging out together?

April Miller - Cross

1    A.    Yes, sir.

2    Q.    A lot?

3    A.    Yes, sir.

4    Q.    You were doing drugs together?

5    A.    Yes, sir.

6    Q.    You were selling drugs together?

7    A.    Yes, sir.

8    Q.    Y'all were having sex with each other?

9    A.    Yes, sir.

10   Q.    Very close.  And at that time you were

11   getting in trouble a lot like you said?

12   A.    Yes, sir.

13   Q.    You were going to jail a lot?

14   A.    Yes, sir.

15   Q.    And shortly after -- well, Eugene hung out

16   with these other two people some, correct?

17   A.    Yes, sir.

18   Q.    And you hung out with Mr. Payne?

19   A.    Yes, sir.

20   Q.    Well, isn't it true that shortly after this

21   murder that Eugene Sanders just stopped associating with

22   you?

23   A.    Yes, sir.

24   Q.    Just dropped you?

25   A.    No, I wouldn't say it just like that but,

April Miller - Cross

1    yes, sir.

2        Q.    Yeah, he dropped you.  And your feelings were

3    hurt?

4                BY MR. McCOU:  Is that a question, your

5        Honor?

6                BY THE COURT:  That objection is sustained.

7        Q.    And your feelings were hurt, weren't they?

8        A.    Not really.

9        Q.    Not really?

10       A.    Yes, sir.

11       Q.    So in October you just decide, well, I'm

12   gonna come forward.  Had any type of people talk to you

13   about that murder before October 2017?

14       A.    No, sir.  I got incarcerated August 7th.  I

15   do remember that date directly because it was my sister's

16   birthday, and when I went to jail it was for a trailer

17   and a car that I owned but they had said -- they didn't

18   say anything directly to me, but when I bonded out they

19   said I will see you soon, and that was the police

20   officer, so.

21       Q.    But nobody said anything that you were a

22   suspect in this case, did they?

23       A.    No, sir.

24       Q.    And you just up in October decide you're

25   going to turn yourself in and everybody else, right?

1    A.    No, sir.  I got locked up and then when I was

2    in jail and safe, yes, that's when I did that.

3    Q.    In jail and safe?

4    A.    Yes, sir.

5    Q.    You're gonna rat on yourself and rat on the

6    other ones that had cut you out of their lives?

7    A.    Well, if sobeit.  You know, that's the right

8    thing to do.

9    Q.    Right thing to do?

10   A.    Yes, sir.

11   Q.    You didn't have any motive to do that?

12   A.    No, sir, just to do the right thing.

13             BY MR. GORE:  I tender, your Honor.

14             BY THE COURT:  Any redirect?

15             BY MR. McCOU:  Yes, your Honor.

16   **REDIRECT EXAMINATION BY MR. McCOU:**

17   Q.    Ms. Miller, when you were being

18   cross-examined by Attorney Gore, you mentioned being

19   safe.  What did you mean by that?

20   A.    Meaning as, you know, nothing could happen to

21   me if I was safe and nobody could get to me.  You know, I

22   can tell what I got to tell.

23   Q.    Without any consequences from any of the

24   people that were involved?

25   A.    Yes, sir.

1       Q.      You were also asked about some of the prior

2   charges that you had had, and I think you mentioned

3   mainly property crimes.

4           When you spoke with the investigators about this

5   case, was that something that you took into

6   consideration?  Were you looking for any type of benefit

7   for any past crimes or future crime?

8       A.      No, sir.  I can talk.  No, sir, I didn't

9   because I had already got done with them charges.  I have

10   no felony on my record.  Everything is dropped, you know

11   what I'm saying.  I either did my time, paid my fines or

12   got bonded out, you know.  I have nothing pending.

13       Q.      When this came about, the statement that they

14   were referencing when asking you questions, you didn't go

15   in with expectations to get --

16       A.      No, sir.

17       Q.      And did any of the investigators convey any

18   benefits that you could possibly receive?

19       A.      No, sir.

20       Q.      You were asked about whether or not in your

21   statement told the investigators that there was a camper

22   out there.  Do you recall even being asked about a camper

23   in that statement?

24       A.      No, sir, I don't.

25       Q.      And you were also asked about whether or not

1    you told them about possibly going to Gene Long's house.

2    Do you recall if they asked you about a Gene Long?

3         A.    No, sir, I don't recall.

4         Q.    Did Gene Long's name come up in any of the

5    activities that involved this homicide?

6         A.    No, sir.

7         Q.    You were also asked why out of the four of

8    you-all you were testifying and they were over here, and

9    you were specifically asked whether you were special or

10   what was special about you.  To your knowledge, did any

11   of these three admit to doing anything that you know of?

12        A.    No, sir, not to my knowledge.  I don't know.

13        Q.    You were asked about some of the things that

14   you may have done to secure drugs or get drugs.  When you

15   gave that statement in 2017 about what happened with the

16   four of you-all, at that point were you seeking drugs or

17   seeking to get drugs from giving that statement?

18        A.    I was in jail when I gave that statement.

19        Q.    So just to be clear, were you seeking drugs

20   or giving a statement for drugs or anything in return?

21        A.    No.  I probably was high from when I came in

22   but, no, sir, I wasn't seeking drugs then.

23        Q.    And you also testified earlier that there are

24   some things about that time period and that day that you

25   couldn't recall, but I believe you said in your statement

April Miller - Redirect

1    that you gave, if you said it then it's true?

2         A.    If I said it then it's what it is, yes, sir.

3    As of now I can't recall.

4         Q.    When you say if you said it it's true, so

5    when you told them that you-all planned the robbery and

6    that Sanders and Payne got out and you heard the gunshot,

7    are you saying that if you said it then that that's true

8    and that's what happened?

9         A.    That's what I'm saying, yes, sir.

10              BY MR. McCOU:  No further questions.

11              BY MR. SANDERS:  Your Honor, may we

12        approach briefly?

13              BY THE COURT:  You may.

14              (THE FOLLOWING BENCH CONFERENCE WAS HAD

15        OUTSIDE THE HEARING OF THE JURY:)

16              BY MR. SANDERS:  Your Honor, I think we may

17        need to proffer Mr. Simmons because she says that

18        she haven't been given any type of incentive to

19        testify today.  I find that hard to believe.

20              She has not been charged.  She's here

21        testifying.  She's getting something out of it and

22        she says she's absolutely getting nothing.  I don't

23        believe that --

24              BY MR. McCOU:  She was indicted.  She has

25        been charged.  And again, we've been up here

1  repeatedly on speculation.  If there's something

2  that gives reason to believe or something you can

3  point to that's one thing, but just because you

4  believe something that's --

5          BY MR. SANDERS:  I ask to proffer counsel,

6  your Honor?

7          BY THE COURT:  You can ask him.  If he says

8  it's not true you can put that on the record if you

9  want to.  I think we'll take a break now and go eat

10  lunch.

11          (BENCH CONFERENCE CONCLUDED.)

12          BY THE COURT:  Ladies and gentlemen, we

13  will now take a recess for lunch.  I'm gonna

14  dismiss you to go eat lunch, and please be back at

15  1 o'clock.  This thing turns itself off.  It's time

16  to go eat lunch.  Please be back in the jury room

17  at 1 o'clock.

18          (THE JURY LEFT THE COURTROOM 11:46 A.M.)

19          BY THE COURT:  What disposition is to be

20  made of the witness?  Is she to remain here or

21  returned to Sunflower County?

22          BY MR. McCOU:  She can be returned as far

23  as we're concerned, your Honor.

24          BY THE COURT:  Is anybody else gonna need

25  her for the rest of the trial?

April Miller - Redirect

```
 1              BY MR. LITTLETON:  I'm sorry, I didn't hear
 2       you, your Honor?
 3              BY THE COURT:  Does the witness need to be
 4       retained in Washington County?  She's apparently
 5       incarcerated in Sunflower County.
 6              BY MR. SIMMONS:  No, your Honor.  The
 7       reason why she was in Sunflower County because she
 8       -- actually it was for her safety.  I think one of
 9       the defendants was actually in Washington County,
10       so she's been in Sunflower County.
11              BY THE COURT:  Does she need to be retained
12       in the courtroom for the -- does she need to be
13       retained here for further testimony?
14              BY MR. SIMMONS:  If they're done with her
15       she can go back to Sunflower County.
16              BY MR. LITTLETON:  We think so, your Honor.
17              BY THE COURT:  All right.  She should be
18       retained here and then we'll dismiss her later.
19       All right.  We're in recess until 1 o'clock.
20                   (LUNCH RECESS 11:47 A.M.)
21              BY THE COURT:  You may proceed.
22              BY MS. RODGERS:  Your Honor, we call Lisa
23       Latham.
24                        LISA LATHAM,
25       called on behalf of the defendant, having been duly sworn
```